UNITED STATES of America,
Plaintiff–Appellee,

v.

Billy R. ASHLEY, Shaunessy R. Sylvester, Craig Crofton a/k/a Craig C. Ashley, and Leroy Lambert, Defendants–Appellants.

Nos. 94–1731, 94–1732, 94–1814 and 94–1978.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1994.

Decided April 25, 1995.

Robert T. Coleman, Asst. U.S. Atty. (argued), Crim. Div., Fairview Heights, IL, for U.S.

John A. Hudspeth, Jr., Carlyle, IL, for Billy R. Ashley.

Michal Doerge, Jelliffe, Ferrell & Morris, Harrisburg, IL, for Shaunessy R. Sylvester.

William B. Ballard, Jr., Anna, IL, for Craig Crofton.

R. Greg Bailey (argued), St. Louis, MO, for Leroy Lambert.

Before BAUER and KANNE, Circuit Judges, and SKINNER,* District Judge.

* The Honorable Walter Jay Skinner, of the District

KANNE, Circuit Judge.

The defendants each were convicted of one count of conspiring to possess with intent to distribute a substance containing cocaine and possessing with intent to distribute cocaine base (commonly known as crack). They now appeal their convictions. They claim that the district court erred in refusing to order the prosecution to provide them with the handwritten investigative notes of police and FBI agents. The defendants also assert that they were denied their rights to a fair trial because the venire from which their jury was chosen did not include any blacks. Finally, they claim that the trial court erred in refusing to give four of their proposed jury instructions as tendered. We affirm their convictions.

### I. Handwritten Notes

While investigating the defendants' conspiracy, local law enforcement officers and FBI agents made handwritten notes of interviews with several witnesses. All of the defendants joined in a motion pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), to compel production of evidence favorable to them. Through this motion they hoped to gain access to the officers' and agents' handwritten notes. They alleged that the handwritten notes might contain statements by various witnesses that are inconsistent with the typed reports of those interviews and inconsistent with the trial testimony of the witnesses. As support for this assertion, the defendants cited discrepancies between an officer's notes from an interview with defendant Sylvester and the typed version of Sylvester's statement.

The district court denied the *Brady* motion, but agreed to undertake an *in camera* review of the notes of interviews with witnesses Mary Louise Thomas and JoAngelic Wilson. The judge specifically stated that he would look only for exculpatory material and not for mere inconsistencies.

■ We review the district court's denial of defendants' *Brady* motion for abuse of

of Massachusetts, sitting by designation.

discretion. *United States v. Romo*, 914 F.2d 889, 898 (7th Cir.1990), *cert. denied*, 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). *Brady*, which held that the prosecution may not suppress evidence favorable to an accused where the defendant moves for its production and the evidence is material to either guilt or punishment, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), applies to impeachment evidence as well as to exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). However, evidence withheld by the government is material only if there is a reasonable probability that its disclosure to the defense would have changed the result of the proceeding. *Id.*, 473 U.S. at 682, 105 S.Ct. at 3383. "Reasonable probability" arises where the suppression of the evidence undermines our confidence in the outcome of the trial. *Id.*

▉ In his *in camera* examination of the notes, the district judge found nothing but indecipherable cryptic notations and nothing exculpatory. As also required by *Brady*, however, the district court should have examined the notes for inconsistencies that could have been used to impeach various witnesses.

To verify the district court's analysis that nothing exculpatory was contained in the notes, it was necessary to make our own examination. We looked not only for exculpatory evidence, but also for impeachment material. We are in accord with the district court in finding the notes largely indecipherable and therefore meaningless. There was nothing exculpatory, and there was nothing among the scribbles that one could reasonably identify as useful for impeaching any of the prosecution's witnesses. Thus the content of the notes in no way undermines our confidence in the outcome of the trial. The notes were not material, and the district court committed no *Brady* error.

## II. Racial Composition of the Jury Venire

▉ Defendants claim that they were denied a fair trial because the jury that convicted them was drawn from an all-white venire,

a venire that did not represent a fair cross-section of the community. While juries must be taken from a source that is representative of the community, *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975), the Constitution does not require this to ensure representative juries, but rather impartial juries. *Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990).

▉ To establish a prima facie case that their Sixth Amendment rights to a venire drawn from a fair cross-section of the community were violated, the defendants must show that the group allegedly excluded is a distinctive part of the community; that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). If the defendants establish these elements, the government must show that those aspects of the jury selection process that result in the disproportionate exclusion of a distinctive group manifestly advance an overriding, significant government interest. *Id.*, 439 U.S. at 367–68, 99 S.Ct. at 670; *United States v. Guy*, 924 F.2d 702, 705 (7th Cir. 1991).

▉ Certainly, blacks constitute the sort of group contemplated by the "distinctive member of the community" part of the *Duren* test. As for the second part, the defendants have submitted census figures that show that blacks constitute 3% of the voting age population in the twenty-seven counties that provide jurors for the district court sitting at Benton and nearly 9% of the population of the twelve most southern counties of the twenty-seven.[1]

Zero percent of the venire from which jurors were chosen in this case was black. While the defendants have shown an absolute three percent discrepancy between the per-

1. Actually, defendants refer to the twelve most southern counties of the *Benton Division* of the Southern District. There is no *Benton Division* of the Southern District, but rather a district court sitting at Benton. *See* 28 U.S.C. § 93(b).

centage of blacks in the population of the twenty-seven counties which provide jurors for the district court at Benton and the percentage of blacks on the jury venire, they have not shown that this discrepancy amounts to anything more than a statistical coincidence. As we have noted, a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire. *See United States v. McAnderson,* 914 F.2d 934, 941 (7th Cir.1990).[2]

■ The defendants also fail to establish that the alleged underrepresentation of blacks is due to any systematic exclusion. *Duren* defined "systematic" as "inherent in the particular jury process utilized." *Duren,* 439 U.S. at 366, 99 S.Ct. at 669. The particular jury process used in the Southern District of Illinois for the district court sitting at Benton consists of constructing jury wheels at random from the gubernatorial general election voter registration lists of the twenty-seven counties that provide jurors for that court. *U.S. Dist. Court for the Southern Dist. of Ill., Plan for Random Selection of Jurors (1989) (Plan).* The district judges of the Southern District of Illinois have found that these lists provide a fair cross-section of the community. *Id.* at 2.

We have recently reaffirmed the use of voter registration lists as the source of names for jury venires in this Circuit. *Guy,* 924 F.2d at 707; *see also Davis v. Warden, Joliet Corr. Inst. at Stateville,* 867 F.2d 1003, 1015 (7th Cir.1989), *cert. denied,* 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989) (upholding use of voter registration lists as the source of names for jury venires in Illinois state courts) (collecting cases). Additionally, the federal district court jury selection plan at issue specifically forbids court personnel from discriminating on the basis of race in implementing the plan. *Plan* at 1.

■ Defendants concede that, under the precedent of this circuit, they have no case. They argue, however, that we should reconsider the law as it exists and require the Southern District of Illinois to ensure that racial minorities are represented on every jury wheel proportional to their presence in the community from which the venire is chosen.

Blacks compose 9% of the population in the twelve southern most counties providing jurors for the district court at Benton, defendants note. From that data they argue that there is a systematic problem in the dilution of the juror pool by the 99% white populations of Clark, Clay, Crawford, Cumberland, Edwards, Effingham, Franklin, Hamilton, Jasper, Lawrence, Richland, Wabash, Wayne, and White counties, all of which lie in the northern part of the area providing jurors for the federal court at Benton. If the area from which jurors were selected were limited to the twelve southern counties—the area where the defendants lived and committed their crimes—then, the defendants argue, they would likely have faced a venire that included blacks.

We begin our rejection of the defendants' proposal by noting that they do not really argue that any alleged under-representation has been caused by systematic exclusion of blacks in the relevant community; rather, they argue that the twenty-seven county community itself is the problem—that it covers too much territory. They ask us to apply *Duren* to the initial act of defining the community instead of to the process of drawing the jurors from the community.

Sixth Amendment geographic disputes are not novel, but defendants' argument for a more narrowly focused geographical area from which to select jurors diverges from the typical dispute over what geographic scope the Sixth Amendment contemplates. In

---

2. *See also Guy,* 924 F.2d at 706 (noting the insufficiency of showing an absolute discrepancy without also tying the discrepancy to something other than coincidence); *Ramseur v. Beyer,* 983 F.2d 1215, 1231 (3rd Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993) (concluding that "it is both logical and consistent with the United States Supreme Court's requirements that these challenges be evaluated, first, by determining whether there is a non-random disparity between the percentage of African-Americans" who live in the community and the percentage on the jury list); *but see United States v. Jackman,* 46 F.3d 1240 (2d Cir. 1995) (observing uselessness of absolute disparity analysis where no broad source of names exists to support the argument that the underrepresentation is a mere statistical aberration).

most of the cases we have found, the party challenging the jury selection process was in the position of insisting that the court choose its jurors from a larger geographical area, not a smaller one. *See, e.g., Ruthenberg v. United States,* 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); *Davis,* 867 F.2d at 1007; *United States v. Young,* 618 F.2d 1281, 1288 (8th Cir.1980), *cert. denied,* 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Florence,* 456 F.2d 46, 49 (4th Cir. 1972) (collecting cases). The *Young, Florence,* and *Ruthenberg* cases involved federal trials and held that a petitioner had no right to a venire drawn from an entire federal judicial district. The *Davis* court found improper a Cook County, Illinois jury selection system that drew jurors initially from the entire county but then segregated them according to geographical area within the county. *Id.* at 1013. However, we reversed the district court's grant of habeas corpus because *Davis* failed to show systematic exclusion.

One notable exception to the above tendency arose in California, where a habeas corpus petitioner wanted jurors to be selected only from the central area of Los Angeles County, rather than from the entire county, because that area comprised a community distinct from the rest of the county. *Bradley v. Judges of Sup.Ct. for Los Angeles County,* 531 F.2d 413 (9th Cir.1976). The court rejected this proposal, noting that the Constitution does not require that juries be comprised of any specific characteristics—geographic, racial, or otherwise. *Id.* at 417.

The *Bradley* court's view on this matter represents the heart of the issue. The Sixth Amendment commands that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law ...". U.S. CONST. AMEND. VI. While this establishes a defendant's right to be tried by a jury selected from a fair cross-section of the community, it does not establish a right to a jury of any particular composition. *Taylor,* 419 U.S. at 538, 95 S.Ct. at 702. Again, *Taylor* and *Duren* are about assembling an impartial

jury, not a representative jury. *Holland,* 493 U.S. at 480, 110 S.Ct. at 807.

As discussed in *Zicarelli v. Gray,* 543 F.2d 466, 481–82 (3rd Cir.1976), modern cases interpreting the Sixth Amendment "require that the petit jurors be drawn from within the state and federal judicial district in which the crime was committed, but they do not compel a narrower geographical focus than that." In *Zicarelli* it was noted that these cases are consistent with the understanding of the geographical limitations "expressed by Congress in 1789 and adopted by the states in the following two years." *Id.* at 482. That is, the geographic restraints of the Sixth Amendment only prohibit federal courts from reaching beyond either the state or the federal judicial district to obtain jurors. *Id.* at 481; *see also Ruthenberg,* 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); *Barrett v. United States,* 169 U.S. 218, 228, 18 S.Ct. 327, 331, 42 L.Ed. 723 (1898); *Davis,* 867 F.2d at 1008 (collecting cases).

There is no constitutional mandate that requires federal courts to draw jurors from any more narrowly defined geographic area than that provided in the *Plan for Random Selection of Jurors* promulgated by the Southern District of Illinois and approved by the judicial council of this Circuit pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.*

### III. Defendants' Jury Instructions

■ Defendants also complain that the district court erroneously refused to give their separate tendered instruction numbers five, six, eight, and nine. The district court effectively combined these proposed instructions into one instruction, a practice we find proper. *See United States v. Mitan,* 966 F.2d 1165, 1177 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 994, 122 L.Ed.2d 145 (1993) (noting that the district court does not have to "give a proposed instruction if the essential elements are covered by those that are given.") (citations omitted).

AFFIRMED.