**UNITED STATES of America, Plaintiff,**

v.

**Patrick GREER, Defendant.**

**No. 91 CR 463–2.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 7, 1995.

---

AUSA Colleen D. Coughlin, Chicago, IL, for plaintiff.

David G. Duggan, Chicago, IL, for defendant.

### *ORDER*

LOZANO, District Judge.

This matter is before the Court on the following motions filed by Defendant, Patrick Greer: Motion to Invalidate the Clerk's Methodology for Selecting Jurors in the Northern District of Illinois, forwarded to this Court on May 31, 1995, and Motion to Appoint an Expert to Examine for Racial Bias in the Clerk's Methodology for Selecting Jurors in the Northern District of Illinois, forwarded to this Court on July 20, 1995. For the reasons set forth below, both Motions are hereby **DENIED.**

*Motion to Invalidate the Clerk's Methodology for Selecting Jurors in the Northern District of Illinois*

Defendant, Patrick Greer ("Greer"), is charged with conspiracy to distribute heroin,

cocaine, and cocaine base, and with possessing cocaine with intent to distribute. Greer, an African–American, argues that the method that will be used to assemble the jury pool in his case will violate the Sixth Amendment because it will result in an unfairly low percentage of African–Americans in the jury pool.

Under the Seventh Circuit's Plan for the Random Selection of Jurors, the jury pool in Greer's case will be assembled using a list of registered voters living in the eight counties making up the Northern District of Illinois, Eastern Division. From the registered-voter list, "jury venires" and "jury panels" [1] (collectively "jury pools") are compiled. The parties do not dispute that the registered-voter list that will be used in Greer's case was compiled without using the procedures set forth by Congress in the National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg, *et seq.* ("Act"). The Act, commonly known as the "motor voter" law, requires Illinois and other states to take certain measures designed to make voter registration easier and thereby "increase the number of eligible citizens who register to vote." 42 U.S.C. § 1973gg(b)(1); *Ass'n of Community Organizations for Reform Now (ACORN) v. Edgar,* 56 F.3d 791, 792–793 (7th Cir.1995). As the Act's common name suggests, these measures include allowing citizens to register to vote simultaneously with applying for a driver's license. *ACORN,* 56 F.3d at 792–793.

Illinois has refused to comply with the Act. *Id.* When its noncompliance was challenged in federal district court, Illinois argued that the Act is unconstitutional. *Id.* at 792. The district court rejected Illinois' argument and entered a "sweeping injunction" requiring compliance. *Id.* On appeal, the Seventh Circuit affirmed, although it did trim the district court's detailed injunction to a simple command that Illinois adhere to the Act. *Id.* at 798. The court also dissolved the stay of the injunction that had been in effect pending appeal. *Id.* at 798.

Greer's argument is based on the Sixth Amendment, which guarantees a criminal defendant an impartial jury. U.S. Const. amend. VI. As part of this guarantee, a defendant has the right to have a jury selected from a representative cross-section of the community. *United States v. Guy,* 924 F.2d 702, 705 (7th Cir.1991). Greer predicts that his jury pool will not embody a representative cross-section because of lack of African–Americans.

Greer acknowledges that his argument is subject to the test set forth in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) and since followed by the Seventh Circuit in *Guy* and other cases. Under the *Duren* test, "to establish a prima facie violation of the fair cross-section requirement" Greer must show:

> (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Guy,* 924 F.2d at 705. In summary, then, the three prongs of the *Duren* test are distinctive group, under-representation of the distinctive group, and systematic exclusion of the distinctive group. *See id.*

Greer has satisfied the distinctive group prong; African–Americans unquestionably form a distinctive group. *See Guy,* 924 F.2d at 705 (noting that the parties did not dispute that African–Americans are a distinctive group). As for the under-representation prong, Greer has offered no evidence whatsoever that Eastern Division jury pools have under-represented African–Americans in the past or will do so in the future. *Cf. Duren,* 439 U.S. at 362–63, 99 S.Ct. at 667–68 (defendant offered statistics detailing how at each stage of jury pool creation women were under-represented). As such, Greer has failed to satisfy the under-representation prong.

---

1. The Plan defines a "jury venire" as "all prospective jurors summoned for jury service pursuant to a particular order of court." It defines "jury panel" as "that group of prospective jurors chosen from the jury venire for the purpose of selecting a specific jury."

Greer's counsel suggests that he may offer more proof of under-representation later. He cites a 1990 census figure of the percentage of African–Americans living in the Eastern Division while indicating that he might seek to amend his Motion based on how this figure compares with the percentage of African–Americans who appear in his venire when trial begins. Still, by itself, even a marked lack of members of a distinctive group in the specific venire from which a jury is chosen does not necessarily establish under-representation in the jury pool. *See United States v. Ashley*, 54 F.3d 311, 313 (7th Cir.1995) ("[A] discrepancy of less than 10% alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire.") (citing *United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir. 1990)); *cf. Davis v. Warden*, 867 F.2d 1003, 1013 (7th Cir.), *cert. denied*, 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989) ("Raw census figures showing a disparity as large as 25% may establish that blacks were under-represented on the jury list."); *see also Duren*, 439 U.S. at 366, 99 S.Ct. at 669 (requiring the defendant "to show that the under-representation of women, *generally and on his venire*, was due to their systematic exclusion") (emphasis added).

Neither has Greer offered any proof of the systematic exclusion prong. He has presented no direct evidence whatsoever of systematic exclusion of African–Americans in Eastern Division jury pools. Granted, Greer did submit the jury selection plan discussed above, yet he in no way attempted to show how the mechanics of this plan result in unrepresentative jury pools. *Cf. Duren*, 439 U.S. at 366, 99 S.Ct. at 669 (noting that the defendant's "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the under-representation [of women] was systematic—that is, inherent in the particular jury-selection process").

For its part, the Government asserts that of the current pool of qualified jurors available for service in the Eastern Division, 16.47% are African–American. The Government reports that according to the 1990 census, 18% of the adult population of the Eastern Division is African–American (Greer cites a less relevant *total* population figure of 19.6%). These figures depict only a de minimis disparity between adult African–American population and qualified African–American jurors, which will not likely satisfy the under-representation prong of the *Duren* test. *See Ashley*, 54 F.3d at 313; *cf. Davis*, 867 F.2d at 1013. To the contrary, in this Court's estimation the close match between the population at large and the jury pool works against Greer on the under-representation prong of *Duren*, as well as on the systematic exclusion prong.

The Court suspects that all this is not lost on Greer's counsel, who seems to hinge his argument on using the Act as a new twist on the *Duren* analysis. He focuses on the following language in the Act's "findings" section: "Congress finds that ... discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a). Greer argues that as a consequence of this finding, "for the last two years, the Seventh Circuit has been on notice that there is discrimination in voter registration in Illinois, yet has done nothing to correct the method by which [prospective] jurors are selected in the Northern District [of Illinois]." (Mot. pp. 2–3)

Although Greer has not phrased it as such, his Act-based argument essentially rests on a series of logical conclusions: (1) the Act's findings show that any voter-registration system that does not incorporate the Act causes under-representation of African–Americans on registered voter lists; (2) Illinois' system does not incorporate the Act and therefore under-represents African Americans; (3) the Eastern Division selects jury pools from an Illinois registered-voter list; (4) therefore, Eastern Division jury pools under-represent African–Americans.

The first, foundational premise of Greer's logic is that the Act somehow shows conclusively that registration practices which

inhibit minority voter registration are widespread in the states. Yet the Act's language is too general and terse to support this point. The Act merely intones the truism that "discriminatory and unfair registration laws *can* have a direct and damaging effect on voter participation." 42 U.S.C. § 1973gg(a)(3) (emphasis added). This language does not amount to a specific finding that discriminatory registration practices exist in any state. Moreover, even if we assume that Congress affirmatively found that some states have discriminated, nothing says that Illinois is one of those states. Thus, the foundational point of Greer's argument—that Illinois impedes voter registration by African–Americans—has no substantial support in the cornerstone of the argument, *i.e.*, the Act.

■ Greer's argument is also undermined by the fact that by its own terms, the Act simply has nothing to do with jury pool selection. The Act's precise stated purpose is increasing registration among all eligible voters, although one can gather from the findings that a more specific purpose is increasing the number of registered minority voters. *See* 42 U.S.C. § 1973gg(a)(3) & (b)(1). The Act says nothing about increasing minority representation among prospective jurors. Of course, in many jurisdictions jury pools are drawn from voter-registration lists, meaning that often, the composition of the pools will be influenced by such lists. Yet Congress did not address or even acknowledge this voter-venire connection in the Act.

■ Most importantly, Greer's argument is undermined by established precedent. At bottom, Greer's argument is an attack on cases decided prior to the Act that have established virtually beyond challenge that voter registration lists are a constitutionally acceptable source of prospective jurors. *Guy*, 924 F.2d at 707; *Davis*, 867 F.2d at 1015; *see also Ashley*, 54 F.3d at 315. Greer asserts that a broad legislative finding and statement of purpose have now thrown this uniform view into doubt. He argues that a few words in legislation that affects jury pools only indirectly shows that all the prior cases endorsing voter registration lists as a source of jury pools were wrong. The Court must conclude that the Act's general statement of legislative motivation has not had that effect.

Though he has not phrased it as such, Greer may also argue in the alternative that even if the current jury pool selection method is acceptable, the new Act-based system, which will in theory expand voter registration, is better. In short, Greer would argue that he should have the benefits of the Act, which, as covered above, Illinois has refused to implement. Yet the Government asserts that even if Illinois had timely complied with the Act, lag-time inherent in the system of compiling jury pools would mean that the effects of that compliance would not have yet been manifested in the jury pool from which Greer's jury will be drawn. This assertion is no more than that, and without further proof the Court cannot accept it as true. However, since Greer has not contradicted the Government, the Court will assume that Greer cannot show that timely adherence to the Act would have affected his jury pool.

■ The Government also argues ripeness, standing, and failure to exhaust administrative remedies. The ripeness and standing arguments seem novel, if not misplaced. Ripeness and standing are part of the justiciability doctrine, which deals with federal courts' subject matter jurisdiction as delineated by the Article III case-or-controversy requirement and judge-made jurisdictional limits. *See* 1 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* §§ 2.13(a), 2.13(d), 2.13(f) (2d ed. 1992). Moreover, issues of ripeness and standing arise typically if not exclusively where a civil plaintiff is seeking to challenge governmental action. *See id.;* 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531, at pp. 340–41 (2d ed. 1984); *Federal Dep. Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 264–65 (E.D.Cal.1987). In short, the ripeness and standing doctrines bear primarily if not solely on subject matter jurisdiction of entire civil cases, and have little apparent relevance to a criminal defendant's pretrial motion. Rather, the most specific test of Greer's motion is *Duren*, and the timing and nature of Greer's arguments do not, the Court believes, make *Duren* any

less controlling. Also, on a practical note, the treatment of Greer's motion above perhaps touched on some of the fundamental themes running through justiciability doctrines, and in this way incorporated the heart of the Government's ripeness and standing arguments. In sum, the Court finds the specific ripeness and standing arguments of the Government to be superfluous.

The exhaustion of remedies argument is rather terse and comes off as something of an afterthought. Moreover, the Court fails to see how the exhaustion requirement placed on private causes of action brought under the Act applies to a criminal defendant's challenge to jury pool selection. In no readily apparent sense can Greer be seen as pursuing an Act-based private cause of action. If the Government is serious about this argument, it will have to provide more detail and support before the Court will seriously entertain it.

*Motion to Appoint Expert*

At the status conference in this case held on June 29, 1995, defense counsel stated that he would like to have an expert appointed to further investigate the Eastern Division's jury selection scheme. The Court indicated that based on what counsel had presented so far, appointing an expert to be paid out of federal funds might not be justified. The Court indicated it would be happy to hear oral arguments on the record and told counsel that, in the alternative, if he could make a preliminary showing in writing that an expert's efforts would be fruitful, he could file a motion to that effect and the Court would then consider appointing an expert. The present motion is counsel's effort along those lines. The Court is not persuaded.

Greer has added a new twist to his argument. In the jury selection motion he alleged, without differentiating by gender, that the African–American population as a whole is under-represented in the jury pool. He now also asserts that African–American males are under-represented.[2]

■ Aside from its raising an entirely new issue at this relatively late stage, the Court finds two problems with Greer's assertion that his right to a jury selected from a fair cross-section is being infringed by under-representation of African–American males. First, the Court is not convinced that African–American males should be recognized as a distinctive group under *Duren.* Greer identifies no authority that African–American males, or any other group defined along race *and* gender lines, is a *Duren* distinctive group. As reasons for recognizing the group, defense counsel asserts that "[m]ales, at least the last time [counsel] checked, are distinct from females," makes an oblique reference to adjudication of sex crimes, and cites studies that in no way deal with under-representation along gender or race-and-gender lines. These are hardly persuasive reasons.

■ Of course, no new ground would ever be broken if courts required firm precedent for every step they took. But the step Greer is asking for is a major one, and in this Court's estimation not constitutionally required. Under equal protection doctrine in general and through *Batson* and its progeny, we have certainly recognized that classifications and treatment that are race- or gender-based warrant special scrutiny and protections. Yet Greer has not identified and the Court is not aware of any constitutional doctrine drawing further, finer distinctions in classes along a combination of race and gender lines. Moreover, a rationale certainly underlying *Duren* and its progeny is ensuring that minority groups which have been historically discriminated against are not systematically excluded from jury pools. *Duren* already covers what are arguably the two largest such groups, African–Americans and women, in a way that reasonably ensures basic fairness and impartiality. The Court

2. Greer also asserts that white females are over-represented. While Greer does not identify the significance of this figure, one might imagine the point being that if one group, white females, is over-represented, then another group, African–American males, must be under-represented. While this principle might apply when a total population is divided into just two subsets, e.g., male and female, it does not necessarily hold true when the population is divided into four subsets, as Greer has implicitly done (African–American males, African–American females, white males, and white females).

concludes that recognizing the subgroup of African–American males as a *Duren* distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded by the Sixth Amendment, which requires only a cross-section that is fair, not one perfectly attuned to multiple variables.

The second problem with Greer's new twist is that even if African–American males were a distinctive group, Greer has not given the Court any reason to believe that they are unfairly and unreasonably under-represented within the meaning of *Duren.* Figures of the 1990 census indicate that African–American males represent 7.98% of the total adult population (eighteen and over) in the Eastern Division. African–American males make up 5.29% of the Eastern Division's current master jury wheel and 5.73% of the current qualified jury wheel.[3] This disparity is insufficient for the *Duren* under-representation prong.

Greer suggests that the "10% discrepancy is insufficient" benchmark that has been employed in connection with the under-representation prong is both statistically unsophisticated and unclear in its application. Yet the Seventh Circuit's recent invocations of the benchmark evidence a belief that its sophistication suffices for constitutional purposes even today, when, as Greer stresses, the technology of statistical analysis may far surpass that available thirty years ago. *See, e.g., Ashley,* 54 F.3d 311, 313 (1995 decision); *McAnderson,* 914 F.2d at 941 (1990 decision).

As for clarity of application, *McAnderson* is both clear and forecloses Greer's arguments. In that case, roughly 12% of the venire members were African–Americans, and 20% of the relevant population was African–American. 914 F.2d at 941. Thus, the number of African–Americans in the venire, i.e., the jury pool, was roughly 40% lower than it would have been had the pool perfectly mirrored the percentage of African–Americans in the relevant population. The *McAnderson* court ruled that this disparity did not

meet the *Duren* under-representation prong. *Id.* Using the Eastern Division's current 5.73% qualified jury wheel figure and the 7.98% census figure, the number of African–American males in the jury pool here is 28% lower than it would be if the pool perfectly mirrored the percentage of African–American males in the relevant population. The result under *McAnderson* is obvious. *See also Ashley,* 54 F.3d at 314 (finding an inadequate showing on the under-representation prong where the venire had no African–Americans and the relevant population had 3%). As for the census and qualified jury wheel figures for *all* African–Americans, they exhibit a mere 9% disparity from this perspective, a disparity, that passes muster even under the most demanding interpretation of the "10% is insufficient" benchmark.

▮▮ Greer submitted the affidavit of Gregory Greiff, who states that there is a "99% likelihood" that the master and qualified jury wheels "are under-representative of black males," and that "[i]n general, there is a high degree of probability that ... blacks (without regard to gender) are under-represented in the jury wheels." (Greiff Aff. ¶ 3) Yet nowhere does Greiff state *by how much* these groups are under-represented. Because what may be a significant variance to a statistician is not necessarily significant under the Sixth Amendment, these statements do little to bolster Greer's case. Similarly, the affidavit of Patricia McEvoy asserts, without further elaboration, that the percentage of African–American males in the jury wheels is "outside the range of normal statistical variance." (McEvoy Aff. ¶ 4)

Finally, the Court notes with displeasure the inflammatory language employed by defense counsel in the reply brief. Counsel asserts that the Government has taken a "morally indefensible position," "is afraid that it cannot prove a case against a black person to black jurors," "continues to rely on faulty if not fraudulent statistics," and possesses a "plantation" attitude. Although mindful of the value of spirited advocacy as

---

**3.** Although Greer suggests that these figures are not accurate or authenticated, he has not specifically backed up these suggestions nor offered specific contradictory figures of his own. Under

the *Duren* test Greer has the initial, prima facie burden; accordingly, the Court will not discount these ostensibly reliable figures.

well as the stresses and frustrations of the legal profession, the Court can hardly imagine a time when such language would be welcome. Moreover, such language never persuades the Court.

*Conclusion*

For the foregoing reasons, the Motion to Invalidate the Clerk's Methodology for Selecting Jurors in the Northern District of Illinois is hereby **DENIED** and the Motion to Appoint an Expert to Examine for Racial Bias in the Clerk's Methodology for Selecting Jurors in the Northern District of Illinois is also **DENIED.**