UNITED STATES of America,
Plaintiff–Appellee,

v.

Timothy S. RASZKIEWICZ,
Defendant–Appellant.

No. 98–1525.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1998.

Decided Feb. 18, 1999.

Monica Rimai (argued), Thomas P. Schneider, Office of United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Dean A. Strang (argued), Michael J. Fitzgerald, Fitzgerald & Strang, Milwaukee, WI, for Defendant–Appellant.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Timothy Raszkiewicz wins no points for honesty, but even the district court whose judgment he appeals could not fail to remark upon the "insouciance" and "uniqueness" of his approach to bank robbery. In December 1992, Raszkiewicz held up the First Financial Bank in Milwaukee, where he had worked as a security guard and had learned how to circumvent the bank security system. On that occasion Raszkiewicz was dressed in an overcoat and wore a skull mask. In May 1993, Raszkiewicz appeared again at the First Financial Bank. This time, however, he wore a gorilla suit and a tuxedo and carried a bunch of silverized helium "Happy Birthday" balloons. Posing as a "gorilla-gram" delivery man, he bluffed his way past the security guards, persuading them to allow him to enter the closed bank under the pretense of delivering a birthday gift.

Upon entering the bank, Raszkiewicz let go of the balloons, thus occupying the attention of a well-intentioned security guard who went to fetch a ladder to retrieve them. Raszkiewicz then approached teller Brenda Bargielski, saying, "This is it for you, you're being robbed," and directed her to open the vault. He told her that he had a police scanner. When another teller, Anton Butkovic, arrived for work, Raszkiewicz ordered him to lie on the floor, pointing toward him with some sort of unknown object in one hand and gesturing with the other hand stuck in the pocket of his tuxedo jacket in a manner that made Butkovic think that Raszkiewicz had a gun, although he was in fact unarmed. Raszkiewicz said that he did not intend to hurt anyone. When he bounced a packet of money off Bargielski's chest, apparently meaning to throw it to her, he apologized. Raszkiewicz then left with more than $35,000 and the balloons, which the security guard handed back to him as he left.

Raszkiewicz was ultimately caught when police and tax authorities, who suspected an inside job, investigated former employees. He was indicted under 18 U.S.C. § 2113(a) in the Eastern District of Wisconsin for the "gorilla suit" bank robbery and for money laundering offenses involving the purchase of rental property with the proceeds of the two bank robberies in violation of 18 U.S.C. §§ 1956–1957. Raszkiewicz moved for dismissal of the indictment, arguing that the jury selection process for the grand and petit jury venires in the Eastern District of Wisconsin violated his Sixth Amendment right to an impartial jury made up of a fair cross-section of the community because it excluded all Indians who live on the six reservations in the Eastern District of Wisconsin. The motion was referred to a magistrate judge, who recommended that it be granted, but the district court rejected the magistrate judge's recommendation and denied the motion to dismiss.

Raszkiewicz then pled guilty to the money-laundering charges and went to trial on the

bank robbery count. He was convicted by a jury, sentenced to 78 months in prison, and ordered to make restitution in the amount of $35,717.35. The district court increased Raszkiewicz's sentence level by two steps under the Sentencing Guidelines (U.S.S.G.), finding that Raszkiewicz's gesture indicating that he had a gun together with an order that the victim lie down constituted a "threat of death" within the meaning of U.S.S.G. § 2B3.1(b)(2)(F).

Raszkiewicz appeals on two issues. He challenges the district court's ruling that the juries involved in his indictment and trial were selected from a fair cross-section of the community. He also disputes the applicability of the sentencing enhancement for threat of death. We affirm his conviction and sentence.

## I.

■ We first consider Raszkiewicz's Sixth Amendment attack on the representativeness of the jury selection process in his case.[1] The procedure for selecting jurors in the Eastern District operates to exclude all Indians who live on reservations—"reservation Indians"—from venire plans. "Urban Indians," who live away from reservations, are not excluded. Under its own Plan for Random Selection of Grand and Petit Juries (the "Plan"), the Eastern District of Wisconsin is divided into two parts, the Milwaukee Division in the south and the Green Bay Division, including all six Indian reservations, in the north. When a trial is to be held in a division, the Plan calls for the petit jury to be selected from the counties within that division. But there has been no jury trial in the Green Bay Division since at least 1992, so that no potential jurors have been selected from that division since that time. Thus no reservation Indians, all of whom live in the Green Bay Division, were included in Rasz-

kiewicz's jury venire. Raszkiewicz argues that this exclusion violates his constitutional right to be indicted and tried by a fair cross-section of the population. Although one might doubt the wisdom and reasonableness of the Eastern District's policy, Raszkiewicz has not shown that the defects of that policy rise to a constitutional level.

■ Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review de novo.[2] The Constitution requires that grand jurors and the venire of petit jurors be chosen from a fair cross-section of the community. See *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690. The jury must be chosen from a source which is representative of the community, but the Constitution does not require this to ensure representative juries, but rather impartial juries. *United States v. Ashley*, 54 F.3d 311, 313 (7th Cir.1995). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Accordingly, there is no requirement that a venire or a jury mirror the general population. *United States v. Duff*, 76 F.3d 122, 124 (7th Cir. 1996). Defendants are not entitled to a jury of any particular composition, *Taylor*, 419 U.S. at 538, 95 S.Ct. 692; see also *Holland v. Illinois*, 493 U.S. 474, 482–483, 110 S.Ct. 803, 107 L.Ed.2d 905, so long as there is a fair process which generates an impartial jury. In cases where problems have been found with the representativeness of the jury selection process, "the exclusion [of certain groups] raised at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense

---

1. Raszkiewicz also alleges a violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* The inquiry, however, is the same here as the constitutional fair cross-section of the community inquiry. See *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir.1998); *United States v. Sanchez*, 156 F.3d 875, 879 & n. 3 (8th Cir.1998).

2. We have not previously enunciated the standard of review for a constitutional challenge to

the jury selection process, but see no reason to differ with the view of every Circuit which has considered the matter. See, *e.g., United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir.1998); *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir.1998); *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir.1985); *United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir.1995).

judgment of the community," *Lockhart v. McCree,* 476 U.S. 162, 175, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), among other concerns.

 To make a prima facie case that the fair cross-section requirement has been violated, a defendant must show that: (1) the group allegedly excluded is a distinctive part of the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Johnson v. McCaughtry,* 92 F.3d 585, 590 (7th Cir.1996) (citing *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579). If the defendant establishes these elements, the government must show that those aspects of the jury selection process which result in the disproportionate exclusion of a distinctive group manifestly advance an overriding, significant government interest. *Ashley,* 54 F.3d at 313.

 The issue in dispute here is whether reservation Indians are a "distinctive part of the community," as required by *Duren,* 439 U.S. at 364, 99 S.Ct. 664. Whether or not a class of persons is a sufficiently distinctive group to be cognizable for jury representativeness purposes is a question of fact. *Cf. Hernandez v. Texas,* 347 U.S. 475, 478, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (see p. 464 *infra* and note 3). In rejecting the magistrate judge's recommendation, the district court relied on a three-factor test for "distinctiveness" suggested in *United States v. Smith,* 463 F.Supp. 680, 682 (E.D.Wis.1979) (holding reservation Indians of the Menominee tribe not to be a distinctive group). The test is similar to one later adopted, with slight variations, by several sister Circuits. As the Eleventh Circuit articulated the test, a defendant must show:

> (1) that the group is defined and limited by some factor ( [e.g.], that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group; and (3) that there is a community of interests among members of the group such that the group's

interest cannot be adequately represented if the group is excluded from the jury selection process.

*Willis v. Zant,* 720 F.2d 1212, 1216 (11th Cir.1983); accord *United States v. Canfield,* 879 F.2d 446, 447 (8th Cir.1989); *Ford v. Seabold,* 841 F.2d 677, 681–682 (6th Cir. 1988); *Barber v. Ponte,* 772 F.2d 982, 986–987 (1st Cir.1985) (en banc), *United States v. Fletcher,* 965 F.2d 781, 782 (9th Cir.1992).

 We have not hitherto set criteria for group distinctiveness for fair cross-section purposes, but the 11th Circuit *Willis* test is reasonable. The elements of the test are: (1) the existence of qualities that define a group, (2) similarity of attitudes, beliefs, or experiences, and (3) a community of interest among group members. The test is not to be applied mechanically but must be used with common sense in light of the main purpose of the fair cross-section requirement, *viz.* to provide an impartial jury. See *Ashley,* 54 F.3d at 313. Some of the groups acknowledged to be cognizably distinctive may not satisfy all three of the elements of the test. It might be doubted whether, for example, Mexican–Americans all have similar attitudes or women share a community of interest. In these cases the group-defining factors are, respectively, race and gender. Of course, having similar attitudes or interests may constitute the defining quality of a group, as indeed Raszkiewicz seems to argue with respect to reservation Indians. Similarity of attitudes and community of interests are therefore best understood as important examples, among others, of defining qualities rather than as separate and distinct prongs of a test all the elements of which must be satisfied in order to establish group distinctiveness for fair cross-section purposes.

 The first part of the inquiry, then, is whether some qualities define reservation Indians as a distinctive group. Such characteristics need not be immutable like race, ethnicity, or gender. Religious faith has been held to suffice. See *United States v. Gelb,* 881 F.2d 1155, 1161 (2d Cir.1989) (Jews a distinctive group). The Supreme Court has said that a group historically subject to community prejudices may qualify. *Hernandez*

*v. Texas,* 347 U.S. at 482, 74 S.Ct. 667 (Mexican-Americans a distinctive group under Fourteenth Amendment analysis[3]); see also *Lockhart,* 476 U.S. at 175, 106 S.Ct. 1758. Raszkiewicz argues that reservation Indians should be considered a distinctive group because of their history of discrimination and their shared attitudes and experiences.

We begin with the argument from the history of discrimination. As the district court remarked, Indians as a whole would undoubtedly satisfy the test for distinctiveness because they are a racial group historically subject to community prejudice. Raszkiewicz reminds us that Indians, including reservation Indians, have been subjected to a long history of brutal oppression.[4] Their removal and former confinement to reservations was, as Raszkiewicz says, an important chapter in that history. The question here, though, is whether reservation Indians have been subjected to discrimination because they are reservation Indians, that is, Indians who reside upon reservations, and not "merely" because they are Indians by race or ethnicity.

Raszkiewicz claims that Indian reservations were originally created by the federal government to prevent Indians from participating in the larger polity. He argues that the effect of the Eastern District policy is to perpetuate this exclusion. The policy does indeed have this effect, which is disturbing.

However, the exclusion does not, without more, show discrimination against reservation Indians in particular rather than, say, against Indians as such—and the Eastern District's policy does not exclude Indians as such from jury venires.

Raszkiewicz further argues for distinctiveness from the greater poverty of reservation Indians and accompanying differences in mortality and morbidity between reservation and urban Indians. But poverty and its effects are not peculiar to reservation Indians. Too many people of all backgrounds are poor in our nation. And again, the argument from material disadvantages does not by itself show that these disadvantages reflect discrimination based upon reservation Indian status rather than some other source. Raszkiewicz in fact introduced evidence pointing the other way, alleging that the federal government spends twenty times more on aid to reservations than it does on urban Indians. A case might be made that reservation Indians are a distinctive group because of a special history of discrimination, but Raszkiewicz has not made it out here.

The second part of our inquiry is whether the purportedly distinctive group exhibits similarities of attitudes, ideas, or experience which distinguish it from the general social milieu. In this case, the arguments are both difficult and closely balanced. Raszkiewicz introduced evidence that reservation Indians

**3.** The Supreme Court has categorized blacks and Mexican–Americans as groups who, along with women, have been the subject of prior "jury-representativeness cases." *Lockhart,* 476 U.S. at 175, 106 S.Ct. 1758. Although the cognizability of some of these groups was premised on Fourteenth Amendment equal protection grounds, see *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (plurality opinion) (blacks); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (Mexican–Americans), the Supreme Court suggests that exclusion of these groups might also constitute a violation of the Sixth Amendment fair cross-section requirement. See *Lockhart, supra.* Thus these groups may also constitute *per se* "distinctive groups" for purposes of the Sixth Amendment.

**4.** As President Nixon stated: "From the time of their first contact with European settlers, the American Indians have been oppressed and brutalized, deprived of their ancestral lands and denied the opportunity to control their own desti-

ny." *President's Special Message to Congress on Indian Affairs,* 1970 Pub. Papers: Richard Nixon 564–67, 575–76 (July 8, 1970) (quoted in *Cuthair v. Montezuma–Cortez, Colorado School District No. Re–1,* 7 F.Supp.2d 1152, 1159 (D.Colo. 1998)). See also *United States v. Sioux Nation of Indians,* 448 U.S. 371, 437, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) (Rehnquist, J., dissenting) (acknowledging "tragedy, deception, barbarity, and virtually every other vice known to man in the 300–year history of the expansion of the original 13 Colonies into a Nation"); *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 355, 65 S.Ct. 690, 89 L.Ed. 985 (1945) (Jackson, J., concurring) (noting that Indians "suffered ... privations, indignities, and brutalities [in] the westward march of the whites"). See also Dee A. Brown, *Bury My Heart at Wounded Knee* (1971) (historical treatment of Indians in 19th century America); Vine Deloria, Jr., *The Nations Within: The Past and Future of American Indian Sovereignty* (1984) (same, extended to present).

are more closely identified with their particular tribe, *e.g.*, the Menominee nation, while urban Indians tend to see themselves as Pan–Indian. This might tend to show that reservation Indians are a collection of different groups and not a distinctive group, much as "European" designates various nationalities (French, German, etc.) and not a group,[5] but in any case, it is not clear why the relevant cultural feature that distinguishes the purported group here is association with a reservation rather than identification with a particular tribe, even if the former is a proxy for the latter. Association with a reservation is, however, an imperfect proxy for identification with a tribe, as is illustrated by the fact that the Indian witnesses who testified at the evidentiary hearing on this issue left the reservation only to return later, having seemingly retained their tribal identification despite periods—even lengthy periods—as "urban Indians."

Raszkiewicz argues that reservation Indians are more likely than urban Indians to speak the tribal language, practice tribal religions, enjoy sacred natural areas, maintain contact with their extended families, participate in tribal politics, heed and respect the tribal elders and so forth—in short that they constitute a peculiar culture. These are plausible and serious arguments, but two considerations militate against their deciding the issue. First, as the district court stated, patterns of cross or circular migration on and off the reservations make it misleading to suggest that reservation and urban Indians are two well-defined independent groups. Second, the cultural differences between reservation and urban Indians with respect to social and political associations or religious and linguistic practices, among other bases of community identification, are matters of degree. It is not as if urban Indians never speak the tribal language and so forth. Here Raszkiewicz in fact skates close to arguing that residence on a reservation rather than sharing similar attitudes is the defining question, although he himself expressly rejects this argument.

Raszkiewicz replies that the situation with reservation Indians is no different in this respect than with clearly cognizable distinctive groups, such as Mexican–Americans or Jews, where any similarity of attitudes, ideas, or experience is also a matter of degree. How to determine the existence and limits of a group identity is one of the most intricately vexed and hotly debated questions in contemporary sociological analysis. A leading academic expert, Professor Minow of Harvard Law School, has said, "The persistent failure of group-based categories to yield consistent applications hints at the defects in their boundaries, their origins, their applications, and their ultimate meaningfulness. The coherence [of group identities] is further challenged, though not automatically undermined, by historically shifting boundaries." Martha Minow, *Not Only for Myself: Identity, Politics, and Law,* 75 *Or. L. Rev.* 647, 657–658 (1996). The undoubted reality of particular groups shows that these difficulties can be overcome for legal and social scientific purposes. See *id.* at 697; see also Martha Minow, *Making All the Difference: Inclusion, Exclusion, and American Law* 352–355 (1990) [hereinafter Minow, *Difference]* (discussing whether the Mashpee Indians were a tribe for the purposes of the Non–Intercourse Act of 1790); Milton Fisk, *Ethics and Society* 3–14, 42–43, 106–119 (1980); Iris Marion Young, *Justice and the Politics of Difference* 42–47 (1990) (distinguishing groups from "mere aggregates").

The particular question posed here, whether reservation Indians are a distinctive group for fair cross-section purposes because of purportedly similar attitudes, is a hard one. This does not give us an excuse to dodge the issue. See, *e.g., United States v. Hall,* 93 F.3d 1337, 1342–1343 (7th Cir.1996) (Social science poses "difficulties" for courts, but given its importance in many kinds of cases, courts must assess social scientific evidence "whether it is hard to do or not."); *United States v. Hall,* 165 F.3d 1095, 1119–20 (7th Cir.1999) (Easterbrook, J., concurring)

---

**5.** If we were to draw this conclusion, then Raszkiewicz should have cast his argument in terms of the exclusion of *Menominee,* etc. Indians who live on reservations, rather than in terms of reservation Indians generally. But perhaps this is what he meant, and such an elision in his appeal should not cripple a valid constitutional argument if he had one.

(judges able to "absorb the lessons of science"); see also Bert Black, *et al., Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge,* 72 *Tex. L. Rev.* 715, 720 & n. 15 (1994) (judges competent to appraise scientific reasoning). In the present case, we find the social scientific arguments to be inconclusive. There are good points on both sides but these provide insufficient grounds to decide on a merely sociological basis.

We now turn to the purposes of the fair cross-section requirement. As Professor Minow has said, "the question about the identity of a group ... will forever be befuddling if it is detached from the purposes for which the question is being asked," Minow, *Difference,* at 355, particularly if we lack other bases for decision. Were the distinctiveness of the group in question more clearly established on social scientific grounds, this consideration might have less weight, because the exclusion of a clearly distinctive group itself poses concerns about fairness and impartiality. But where the distinctive status of the group is uncertain, the inquiry into purpose is decisive. We are directed by precedent to consider these purposes in any case.

As noted, the main purpose of the fair cross-section requirement is that the defendant get the benefit of an impartial jury. *Ashley,* 54 F.3d at 313. Analyzing the matter more fully in the light of Supreme Court precedent, we have stated that the purposes of the fair cross-section requirement include "ensuring that the common sense judgment of the community will act as a hedge against overzealous prosecutions; preserving public confidence in the criminal justice system; and furthering the notion that participation in the administration of justice is a part of one's civic responsibility." *United States v. Barry,* 71 F.3d 1269, 1273–1274 (7th Cir. 1995); see also *Taylor,* 419 U.S. at 530–531, 95 S.Ct. 692.

██ Raszkiewicz does not carry his burden that he was denied the benefit of an impartial grand or petit jury by virtue of the Eastern District policy he challenges here. On this point, he raises only the bare possibility that the exclusion of reservation

Indians might have made a difference in assessment of the evidence by a jury, while conceding that the rationale for this is "difficult to articulate concretely." The outcome might have been different had Raszkiewicz shown, for instance, something specific about the purportedly shared values of reservation as opposed to urban Indians which might have led to a different appraisal of evidence at issue in his case. We do not hold that all defendants must show such a tight connection when they allege a jury representativeness problem because of the exclusion of a purportedly distinctive group. A defendant need not, in addition to the three requirements imposed by *Duren,* 439 U.S. at 364, 99 S.Ct. 664 (see above), also show that he was prejudiced by the alleged constitutional violation. As the Supreme Court has said, exclusion of any "large and identifiable segment of the community ... from jury service" wrongly "remove[s] from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff,* 407 U.S. 493, 503, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). Exclusion of a clearly distinctive group therefore creates a presumption of prejudice. But where, as here, it is a close question whether we are dealing with a distinctive group at all because the results of our three-part sociological inquiry into distinctiveness are inconclusive, more concreteness than Raszkiewicz provides would certainly be required to make out a violation.

Addressing the purposes of the fair cross-section requirement discussed in *Taylor,* 419 U.S. at 530–531, 95 S.Ct. 692, Raszkiewicz argues that the exclusion of reservation Indians undermines public confidence in the criminal justice system, especially in view of federal involvement in administering Indian lands. But this is conclusory, since nothing in the record suggests that a reservation Indian or anyone else has good reason to doubt the impartiality of venires which include urban Indians, who are not excluded. Raszkiewicz also argues that far from furthering a belief that sharing in the administration of justice is a phase of civic responsibility, the Eastern District's policy promotes

the view that participation is the province only of those in urban and suburban areas and not rural ones like the reservations. While the exclusion is troubling, the record does not establish the predominantly urban and suburban character of the Milwaukee Division, where all trials in the Eastern District, including Raszkiewicz's, have been held since 1992. Raszkiewicz, moreover, here seems to shift his ground, arguing that rural individuals rather than reservation Indians are the excluded distinctive group, a proposition for which he offers no support.

 Accordingly, we reject Raszkiewicz's fair cross-section of the community claims because he has not established the first prong of the *Duren* test, that the excluded group is a distinctive part of the community.[6] *Duren*, 439 U.S. at 364, 99 S.Ct. 664. This does not mean that with a different record or more precise and concrete argument, we would not conclude that reservation Indians are a distinctive group and that their exclusion from the jury selection process violated a defendant's constitutional and statutory rights. The Ninth Circuit has commented on an Arizona district court local rule similar to the Eastern District of Wisconsin practice at issue here, whereby trials in the Prescott Division of the District of Arizona, which contains a higher proportion of Indians and several reservations, are to be tried in the Phoenix Division. See *United States v. Etsitty*, 130 F.3d 420, 424–426 (9th Cir.1997). The Ninth Circuit did not rule on the constitutionality of the issue, deciding that case on other grounds, but remarked that "[i]f this rule were applied, it would constitute a systematic exclusion of Indian jurors." *Id.* at 426. Here we do reach the

constitutionality of the Wisconsin policy as applied to Raszkiewicz, but if we have resolved it on the record before us differently from the way the Ninth Circuit might have ruled on the Arizona policy had it been presented, we nonetheless share the Ninth Circuit's "deep concern[ ]," *id.*, about this sort of exclusionary policy. Even the "appearance of unfairness" is something that courts should avoid. See *Lockhart*, 476 U.S. at 175, 106 S.Ct. 1758.

II.

At sentencing, the trial court subjected Raszkiewicz's offense level under the Sentencing Guidelines to a two-point enhancement for a "threat of death" under U.S.S.G. § 2B3.1(b)(2)(F), which enhancement he appeals here.[7] This Court has held that a defendant can receive the enhancement for a threatening statement coupled with a menacing gesture which could reasonably be understood as a death threat. *United States v. Hunn*, 24 F.3d 994 (7th Cir.1994). In that case, a note was handed to a teller that read, "This is a hold-up. I have a gun," while the defendant held his right hand with a pointed finger in his coat pocket. *Id.* at 997–998; see also *United States v. Bomski*, 125 F.3d 1115, 1118 (7th Cir.1997) (defendant placed a bag on the counter and said, "This is a bomb, give me all of your money."). We have also held that a threatening statement alone, without any menacing gestures, will qualify a defendant for the enhancement if the statement would put a reasonable victim in fear of her or his life. *United States v. Carbaugh*, 141 F.3d 791, 794–795 (7th Cir.1998). There

6. We need not therefore reach whether Raszkiewicz has established the second prong, that the representation of the group in question, here reservation Indians, in the jury selection process is not fair and reasonable in relation to their number in the community. *Duren*, 439 U.S. at 364, 99 S.Ct. 664. That the underrepresentation of reservation Indians in the jury selection process is due to systematic exclusion, the third prong of *Duren*, *id.*, is not disputed.

7. Raszkiewicz was sentenced in 1998 under a newer version of the U.S.S.G. Until November 1, 1997, the guidelines required an "express" threat of death for the two-step enhancement. U.S.S.G. § 1B1.11(b)(1) (superseded). The term

"express" was deleted from the U.S.S.G., effective upon that date, to resolve a Circuit conflict. A minority took the view that "express" meant "directly stated and not implied." A majority allowed "express" threats to be implied. The conduct which was the basis of Raszkiewicz's enhancement was an implied threat of death. This Circuit adopted the majority view. See *United States v. Hunn*, 24 F.3d 994, 997 (7th Cir.1994). Accordingly, as Raszkiewicz admits, the change in the guidelines makes no difference to his appeal even if, as he argues, he should have been sentenced under the older version of the guidelines.

the statement was: "This is a robbery. Put the money in the bag. I have a gun."

The case before us poses the question whether a menacing gesture alone—including, here, pointing with the unknown object at the victim—without a threatening statement, can constitute a threat of death sufficient to warrant the two-step enhancement under § 2B3.1(b)(2)(F). We see no reason to treat such gestures differently than words and so conclude that a menacing gesture alone, including pointing an unknown object at the victim, can be a threat of death as long it was one that would put a reasonable person in fear of death in the circumstances and as long as there were no unusual mitigating circumstances that would have deprived the gesture of its ordinary and intended meaning.

Our analysis turns on "the perspective of the reasonable [victim]." *Carbaugh*, 141 F.3d at 794. A court "should apply an objective test, what a 'reasonable' victim would read from the robber's conduct." *Id.* (citing *Hunn*, 24 F.3d at 998). So understood, the inquiry is contextual. See *United States v. Gibson*, 155 F.3d 844, 847 (7th Cir.1998) (holding of *Carbaugh* "not absolute. Our question involves sensitivity to fact and context."). Just as in negligence law, where one looks to what a reasonable person would do in the circumstances in exercise of reasonable care, so here one looks to what a reasonable victim would conclude in the circumstances from words and gestures (*Hunn*), words alone (*Carbaugh*), or gestures, including the pointing of the unknown object at the victim.

*Carbaugh*, accordingly, does not establish a *per se* rule that a threatening statement—even, "I have a gun"—is automatically a threat of death as a matter of law, contrary to what the dissent said there. *Carbaugh*, 141 F.3d at 795 (Rovner, J., dissenting). In *Carbaugh*, we said that " 'I have a gun' *can* be a threat of death," *id.* at 794 (emphasis added), not that it *must* be. And we do not hold here that a menacing gesture, including the pointing of an unknown object at the victim, is automatically a threat of death within the meaning of § 2B3.1(b)(2)(F). Because gestures are of their nature typically more ambiguous than words, such a mechanical rule would be even less defensible with gestures than words. A reasonable victim inquiry is in order in either case.

Whether a reasonable victim would be put in fear of his or her life by the defendant's words or gestures, such as the pointing of an unknown object, and whether anything about the circumstances considered as a whole deprives the words or gestures of their ordinary and customary meaning, *Carbaugh*, 141 F.3d at 794–795, are factual inquiries by the district court to be reviewed under a clear error standard. See *United States v. Atkinson*, 979 F.2d 1219, 1222 (7th Cir.1992) ("A sentencing judge's findings of fact at a sentencing hearing are reviewed only for clear error."); see also *Gibson*, 155 F.3d at 845. The factual inquiry into context must be specific and precise. A conclusory statement that mitigating circumstances were absent will be insufficient. Here the district court gave detailed consideration to "the whole situation," noting, among other things, that two victims were ordered to lie face down by one robber in a situation where individuals would not take orders like that unless they feared that there was something to back up those orders. The district court found that a reasonable victim would fear death in these particular circumstances.

Raszkiewicz does not dispute that some gestures may in some circumstances put a reasonable victim in fear of death and so qualify for the enhancement. He gives the example of a finger drawn across the throat. But he claims that the gestures at issue here do not qualify. He has three arguments. The first is that his words negated rather than supported any threat of death that might have been inferred from his gesture. We disagree. His statement that he did not intend to hurt anyone is consistent with the implied threat, *if everyone does what I say*. Presumably he did not think the tellers were going to give him money just because of his unusual attire.

Raszkiewicz's second argument is that it cannot be the case that a robber necessarily threatens death whenever he keeps a hand in his pocket or gestures with an unknown ob-

ject at his victim, because that would create the very *per se* rule which *Carbaugh* precludes. Quite right, but the objection is misplaced, since Raszkiewicz does not show, and it is not true, that the district court wrongly applied a *per se* rule rather than making a contextual inquiry.

 Raszkiewicz's third argument is that a threat of death must involve a level of fear beyond that normally associated with a robbery, or any robbery will automatically qualify for the enhancement. The "enhancement" would in effect be part of the sentence for robbery. A robber who threatens death, he says, must do more than present the mere possibility of a weapon. We agree. But the district court found that Raszkiewicz created more than the ordinary fear associated with a robbery. Raszkiewicz ordered his victims to the floor, backing up his command with menacing gestures that led them to reasonably believe that he was brandishing a weapon. Raszkiewicz's order to lie down, together with the other circumstances of the robbery, including the pointing of the unknown object at his victims, the district court said, generated the additional level of fear associated with a threat of death. The district court's factual determination was not clearly erroneous.

Raszkiewicz's conviction and sentence are therefore

AFFIRMED.