UNITED STATES of America

v.

**Gregory BROADNAX.**

**No. 3:06–CR–30 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Feb. 12, 2007.

William J. Stevens, Lakeside, MI, for Defendant.

Jesse M. Barrett, U.S. Attorney's Office, South Bend, IN, for Plaintiff.

### *MEMORANDUM, OPINION & ORDER*

ALLEN SHARP, District Judge.

This matter is before the Court on Defendant, Gregory Broadnax's, Motion for a New Trial filed on January 19, 2007. (Docket No. 48). For the reasons set forth below, the Defendant's Motion for a New Trial is **DENIED**.

### I.  PROCEDURAL HISTORY

On February 21, 2006, Defendant, Gregory Broadnax ("Broadnax"), was charged in Count One of a one-count Complaint filed by the U.S. Attorney's Office for the Northern District of Indiana. (Docket No.

1). The Complaint charged Broadnax with a violation of 21 U.S.C. § 841(a)(1). A one-count Indictment was returned by a grand jury in this district on March 9, 2006. (Docket No. 19). Count One (1) of the Indictment charged the Defendant with violation of 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute five grams or more of a mixture and substance which contained a detectable amount of cocaine based ("crack"), a Schedule II Controlled Substance. Broadnax proceeded to a jury trial which commenced on January 9, 2007, and the jury returned a verdict of Guilty as to Count One (1) on January 10, 2007. (Docket No. 46). On January 19, 2007, Broadnax filed a Motion for a New Trial. (Docket No. 48).

The Defendant's Motion alleges that pursuant to Fed.R.Crim.P. 33, he is entitled to a new trial because: (1) the jury selection process violated the Defendant's rights under the Sixth Amendment because no questions were asked of prospective jurors about their attitudes toward drugs, drug dealers or recovery; (2) the jury selection process violated the Defendant's rights under the Sixth Amendment because no African Americans were included in the array or venire; (3) the defendant's Fifth Amendment due process rights were violated because the Government "coerced" Rashawn Jackson with the threat of imprisonment so that Jackson would testify and provide information identifying the Defendant as a drug seller; (4) sufficient doubt was created because the police failed to establish a reliable chain of custody between the cell phones recovered and the occupants of the Toyota automobile; (5) the introduction of transcripts of the recorded telephone calls, over objection, was unfair because the Defendant was not identifiable, only Jackson could be understood in the recordings, and the prejudicial effect of introducing the transcripts outweighed their probative value; and, (6)

reasonable doubt existed as to the Defendant's role in the transaction.

The Plaintiff, United States of America, filed a response to Defendant's Motion for New Trial. (Docket No. 49). The Government contends that Broadnax cannot satisfy the standard for a new trial, because a jury verdict in a criminal case is not to be overturned lightly,[1] and the power conferred by Fed.R.Crim.P. 33 is reserved for only the most extreme cases.[2] The Government responded to each basis set forth in Broadnax's Motion for New Trial, as follows: (1) Broadnax did not object during trial to any aspect of this Court's voir dire process, and Broadnax has not shown that the this Court's voir dire process failed to provide a basis for the exercise of the right to challenge;[3] (2) the absence of African Americans from the jury panel, without a clear showing that its absence was caused by discrimination, is no basis for a new trial;[4] (3) the confidential informant in this case, Rashawn Jackson, was not coerced with the threat of imprisonment, Broadnax cross-examined Jackson regarding his possible bias and motive to fabricate,[5] and the evidence of Broadnax's drug dealing was strong and did not depend upon Jackson's testimony;[6] (4) Broadnax did not object to the introduction of the three cellular phones at trial, and the undisputed evidence reveals how the cell phones were recovered and used during the commission of the crime; (5) Broadnax never objected to the introduction of the transcripts of the recorded telephone calls on the basis of unfair prejudice, and admission of the transcripts was proper where the tapes were actually played during the trial and the jury was informed that it could rely only on the tapes if there was any variation between the tapes and the transcripts;[7] and, (6) the question as to whether reasonable doubt existed was a question for the jury and is not proper grounds for a new trial.

## II. ANALYSIS

### A. Gregory Broadnax's Trial[8]

### i. Voir Dire

Prior to bringing the prospective jurors into the courtroom, this Court advised both parties that voir dire would be conducted by the Court; however, the Court also admonished the parties that they could ask the Court to ask further questions.

In conducting voir dire, this Court considered the proposed voir dire questions filed by the Defendant on January 8, 2007. (Docket No. 40). Some, but not all, of the questions proposed by the Defendant were addressed during voir dire. In relevant part, this Court asked the jurors if any of them had training or occasions to deal with controlled substances.

The Defendant did not raise any objection to the voir dire questions asked by the Court or request this Court to ask further

1. Citing to *U.S. v. Morales*, 902 F.2d 604, 605–06 (7th Cir.1990).

2. Citing to *U.S. v. Linwood*, 142 F.3d 418, 422 (7th Cir.1998).

3. Citing to *U.S. v. Sababu*, 891 F.2d 1308, 1325 (7th Cir.1989).

4. Citing to *Fay v. People of State of New York*, 332 U.S. 261, 284, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947).

5. Citing to *U.S. v. Diaz*, 876 F.2d 1344, 1350 (7th Cir.1989).

6. Citing to *U.S. v. Washington*, 184 F.3d 653, 657 (7th Cir.1999).

7. Citing to *U.S. v. Breland*, 356 F.3d 787, 794 (7th Cir.2004).

8. This Court takes judicial notice of the trial proceedings and the evidence presented at trial on January 9, 2007 and January 10, 2007.

questions of the prospective jurors. For the first time, in his Motion for New Trial, the Defendant contends that this Court erred by not specifically asking the prospective jurors whether any of them had strong feelings regarding alcohol, drugs, or drug dealers that would color their view of the case.

### ii. Evidence Presented At Trial

Rashawn Jackson, a convicted felon (for possession of crack cocaine), acted as the confidential informant in the instant case and subsequently testified at Broadnax's trial. Jackson testified to events that unfolded on February 9, 2006, prior to Broadnax's arrest later that day. On February 9, 2006, Jackson was stopped at a stoplight and saw Broadnax driving a gray/silver Toyota Camry. Jackson and Broadnax had a short conversation, and during that conversation Jackson obtained Broadnax's cell phone number and stored it in the memory of his (Jackson's) cell phone. Jackson told Broadnax that he would call Broadnax later in the day. Jackson was later arrested for selling fourteen (14) grams of crack cocaine to an undercover police officer, whom Jackson had previously sold cocaine to on more than one (1) occasion. Upon being arrested on February 9, 2006 and in an effort to avoid being charged with criminal conduct himself, Jackson agreed to cooperate with the police and make calls in order to set up a drug deal. Jackson testified on direct examination that he received no promises about what would happen in his other pending cases, and Jackson confirmed that the Government did not ask him to testify in a certain manner during Broadnax's trial.

On February 9, 2006, Jackson used his cell phone and made several calls to other dealers until he was able to reach Gregory Broadnax.[9] Jackson called Broadnax because he assumed that Broadnax would have the crack cocaine. Once he reached Broadnax via telephone, Jackson used his cell phone to place several other calls to Broadnax's cell phone[10] while the officers were present, but only some of the calls were recorded.

While testifying, Jackson identified a disk that he originally signed and dated, as containing the recorded conversations between Jackson and Broadnax. The disk was admitted into evidence without objection (with regard to the recorded conversations played for the jury). Jackson identified the voices on the recordings as his voice and Broadnax's voice. Further, Jackson testified that prior to trial he helped prepare transcripts of the telephone calls. While on the stand, Jackson reviewed the transcripts, testified that the transcripts were the ones that he helped prepare, and testified that the transcripts represented the true and accurate words as recorded in the telephone calls. When the Government moved for the admission of the first transcript, defense counsel objected on the basis that the transcript was not the evidence, because the evidence was the recording itself. The first transcript was admitted only after this Court indicated that there had to be some indices of accuracy for it to be admitted and determined that a proper foundation was laid. When the Government moved to admit the second transcript into evidence, defense counsel made the same objection, and added other bases for the objection, including that the transcript was a summary, argu-

---

9. Jackson knew Broadnax from childhood and identified Gregory Broadnax sitting at the defense table.

10. Jackson confirmed that he called Broadnax using the same telephone number that Broadnax had given Jackson earlier in the day, the number Jackson saved in his cell phone.

mentative, and the foundation was leading. In admitting the second transcript into evidence, the Court noted the transcript's accuracy, that the evidence was what the jury heard, and that additional instructions would likely be provided regarding the transcripts.

After being admitted, the transcripts were separately displayed to the jury while Jackson testified that the speakers were properly identified in the transcripts by the names "Broadnax" or "Jackson." Jackson also explained that during the first recorded conversation, he told Broadnax that he needed the crack cocaine delivered to the Econo Lodge on Lincolnway in South Bend. Also, Jackson explained that he asked Broadnax how much he was going to charge for one (1) ounce of crack cocaine, and Broadnax replied with the cost. During the second recorded conversation, Broadnax indicated that he was heading to the Econo Lodge.

Upon cross examination, defense counsel attempted to decipher what the term "fam" meant, which was used by Jackson during the recorded conversations. Jackson testified that the term did not mean "family," but it is slang for "buddy" or "man." Jackson repeated that although he recently sold crack cocaine to undercover South Bend police a few times, he was not charged or convicted of those crimes of selling crack cocaine; however, Jackson stated that after testifying in Broadnax's trial, then he expected that he would not be charged. However, Jackson again stated that no one promised him that he would not be prosecuted for selling crack cocaine if he cooperated and/or testified in the instant case. Defense counsel asked Jackson whether he understood that he would be subjected to a mandatory minimum

sentence of ten (10) years, if he was charged and convicted in federal court for his selling fourteen (14) grams of crack cocaine, because he had a prior felony conviction for selling or possessing crack cocaine. Jackson responded affirmatively.

Jackson testified that after he made the recorded calls to Broadnax, Jackson waited at the Econo Lodge parking lot in a police car with a police officer. Eventually, he identified Broadnax's gray/silver Camry pulling into the Econo Lodge parking Lot, the same Camry Jackson saw Broadnax in earlier that day. After Broadnax arrived, Jackson left with the police officer and was not present when Broadnax was arrested.

Sergeant Eric Kaser[11] was the officer assigned to control Rashawn Jackson at all times while setting up the drug buy with Broadnax.[12] Sergeant Kaser's testimony coincided with Jackson's testimony, in that on February 9, 2006, he and Jackson were parked in the Econo Lodge motel on Lincolnway West in South Bend. Sergeant Kaser personally monitored the two recorded telephone calls that Jackson placed to Broadnax, and Sergeant Kaser identified the phone number that he observed Jackson dial in order to call Broadnax. Sergeant Kaser explained that one (1) of the phone calls was not recorded, because he did not have enough time to set up the recording device before Jackson answered his phone. Soon after the last phone call, a silver Toyota Camry pulled into the Econo Lodge parking lot. Sergeant Kaser testified that Jackson identified the Camry as Broadnax's. Sergeant Kaser radioed the other officers informing them that the suspect Camry had entered the parking lot and was heading to the back of the motel,

---

**11.** Sergeant Eric Kaser is an officer with the St. Joseph County Police Department and a member of the Metro Special Operations Section, a special narcotics unit.

**12.** Because Sergeant Douglas Bagarus was the evidence technician, Sergeant Kaser did not examine or process the cell phones.

where Jackson had advised Broadnax to go. After making the radio call, Sergeant Kaser left the area with Jackson.

Sergeant Charles Flanagan[13] testified that he was part of the takedown team that took Broadnax into custody on February 9, 2006. Sergeant Flanagan was stationed at the Econo Lodge when Sergeant Kaser radioed to the takedown team that Broadnax's silver Camry pulled into the parking lot. After the Camry entered the lot it backed into a parking spot, and Sergeant Flanagan positioned his car so his lights were shining into the Camry and to block it from moving. While the other takedown members approached, Sergeant Flanagan exited his car, approached the Camry and yelled for the three (3) men in the Camry to put their hands up because it was the police. Because none of the occupants in the Camry complied, Sergeant Flanagan continued to yell for the passengers to show their hands. During this time, Sergeant Flanagan observed the driver of the Camry lean slightly to his right and bend downward—as if he was putting something on the floor board of the Camry. After several seconds the passengers all raised their hands.

Sergeant Flanagan and another officer opened the driver's side door and placed the driver on the ground, while other members of the takedown team secured the passengers. After removing the driver from the Camry, Sergeant Flanagan conducted a pat down search of the driver and located almost two thousand dollars ($2,000) in his jacket, a bag of marijuana, two (2) cell phones, and an Indiana ID

card bearing Gregory Broadnax's name. He also located a smaller stack of money in Broadnax's pants pocket. Sergeant Flanagan gave the evidence taken from Broadnax to Sergeant Bagarus who photographed the evidence and then placed it into evidence bags. On the stand, Sergeant Flanagan identified Broadnax's driver's license and one of the cell phones which came from Broadnax's left pocket (Gov't Exb. 5B).

After taking Broadnax out of the Camry, Sergeant Flanagan noticed a third cell phone in the Camry on the console; Sergeant Flanagan also observed a plastic bag with a white rock-like substance in it, which turned out to be crack cocaine,[14] located on the floor under the driver's seat closest to the driver's right side-in the area that Broadnax had reached. Sergeant Flanagan's testimony concluded that the Camry had a transmission shift located on the transmission hub a few inches off of the seat (and not on the steering column); however, it did not appear to him that Broadnax was putting the Camry in park when Broadnax reached down before placing his hands in the air.

While testifying, Sergeant Flanagan identified the two additional cell phones: a black cell phone that he found on Broadnax, and a silver cell phone which he located on the console in the Camry. Both cell phones had been placed in another evidence bag by Sergeant Bagarus. The cell phone found on the console in the Camry was photographed before it was confiscated. Defense counsel did not object to the

---

**13.** Sergeant Charles Flanagan is a police officer with the South Bend Police Department and a member of the Metro Special Operations Section.

**14.** The parties stipulated and read into the trial record the following summarized facts: A chemist from the DEA, Erin Feenstra, if called to testify, would testify that in her ex-

pert opinion, the substance recovered from the vehicle Broadnax was driving on February 9, 2006, was cocaine based crack with a weight of 27.1 grams, the same substance admitted as Gov't Exhibit 7. Therefore, the report of her chemical analysis of the crack cocaine was admitted into evidence without objection as Gov't Exb. 8.

admission of the items retrieved from Broadnax's body or to the admission of the third cell phone into evidence.

Sergeant Flanagan testified that Sergeant Bagarus placed one of the cell phones found on Broadnax (Gov't Exb. 5B) in a separate evidence bag from the other cell phones, because it was the cell phone used to contact the confidential informant, Rashawn Jackson. Furthermore, while testifying, Sergeant Flanagan identified four photographs taken at the scene, including, a photo of the silver cell phone on the console of the Camry as originally observed by Sergeant Flanagan before it was recovered, a photo depicting the crack cocaine under the right side of the driver's seat as originally observed by Sergeant Flanagan before it was recovered, a photo depicting the evidence that was removed from Broadnax's person, and a photo depicting the license plate of the silver Camry. The four (4) photographs were admitted without objection.

Sergeant Douglas Bagarus [15] was the evidence technician responsible for entering the evidence taken from Broadnax's February 9, 2006 arrest. On the night of February 9, 2006, after the suspect Camry entered the Econo Lodge parking lot and after the occupants were secured, Sergeant Bagarus took pictures of the scene and collected the evidence. Sergeant Bagarus placed the evidence into sealed plastic bags sometime later. While testifying, he identified the plastic baggy containing the white substance that he recovered from the front driver's seat of the Camry. Because he had processed the cell phones recovered from the scene, determined the

cell phone numbers, and examined the call histories, Sergeant Bagarus was able to identify the cell phone number that belonged to one of the cell phones found on Broadnax (Gov't Exb. 5B), and he was able to identify the incoming and outgoing calls between Jackson's cell phone and Broadnax's cell phone on February 9, 2006. In addition, according to the cell phone history, there was one (1) phone call made by Jackson to Broadnax on February 8, 2006, the day before Broadnax's arrest. Sergeant Bargaus testified that Jackson's cell phone had been used to contact Broadnax on Broadnax's cell phone (Gov't Exb. 5B), but not to call the other two (2) cell phones recovered from the scene.

Sergeant Douglas J. Radican [16] provided the jury with background information regarding police controlled drug buys, the use of confidential informants during drug buys, drug dealer tendencies, and the process used to make and sell crack cocaine. Sergeant Radican explained that a confidential informant facing a narcotics charge can help himself by assisting law enforcement, because the more he helps law enforcement, the more he helps himself, because the police may notify the prosecutor of the informant's assistance.

Sergeant Radican was not present on February 9, 2006, the day of Broadnax's arrest. But he conducted an investigation into Broadnax's drug activity and thought that if there was a good case against a person (as here, against Rashawn Jackson), that the person may act as a confidential informant in order to help themselves out. Sergeant Radican was aware that the assistance provided by Jackson

**15.** Sergeant Douglas Bagarus is an officer with the South Bend Police Department and is assigned to the Metro Special Operations Section as an evidence technician. As an evidence technician Sergeant Bagarus estimated that he has handled thousands of pieces of evidence, and he is responsible for

making sure that the evidence is properly packaged, labeled, recorded, and secured.

**16.** Douglas J. Radican is a police officer with the South Bend Police Department, a task force agent with the Drug Enforcement Administration (DEA), and a narcotics investigator.

would be made known to the local county prosecutor's office.

During his investigation, Sergeant Radican discovered that the car used during Broadnax's February 9, 2006 drug transaction was a silver Toyota Camry rented by Tanikka Broadnax, Gregory Broadnax's sister. A rental agreement was produced. Sergeant Radican stated that he did not know why Tanikka Broadnax rented the Camry and noted that not everyone rents cars for drug deals.

At the close of the Government's case, the Defendant filed a Motion for Acquittal. (Docket No. 43). In relevant part, Defendant asserted that the evidence to support Count One (1) of the Indictment was insufficient to sustain a conviction. The Defendant argued that there was no evidence of the initial agreement which supposedly set up the drug deal between Jackson and Broadnax, but only alleged follow-up phone calls were in evidence. Further, the Defendant asserted that confusion existed as to which cell phone was in Broadnax's possession and that reasonable doubt existed as to whether Broadnax had intent to deliver the cocaine. The Government asserted that the evidence established the drug deal being set up based on the testimony of Jackson and the recorded calls, it established where the drugs were recovered from in relation to Broadnax, and the evidence established which cell phone found on Broadnax was used to make the calls with Jackson. This Court determined that jury issues were present, that the inferences at the time favored the Government, and that Defendant's other arguments concerned circumstantial evidence on which the jury would be instructed.

Therefore, the Court denied the Defendant's Motion for Acquittal.

The trial continued with the Defendant's case, which consisted of testimony provided by two (2) witnesses, Tanikka Broadnax and Keimisha Murray, who has known Broadnax for eight (8) years and has three (3) kids with him. In relevant part, the trial testimony revealed that on January 3, 2006, Keimisha withdrew money from her bank account, in the amount of two thousand dollars ($2,000). On that same date, Keimisha Murray gave this money to the Defendant for what she thought was to be used for purchasing a car. In addition, Tanikka Broadnax's testimony confirmed that she had rented the Camry on February 7, 2006 because she was having car trouble. Tanikka allowed her brother, the Defendant, to borrow the Camry on the evening of February 9, 2006. Broadnax was supposed to be shopping for Valentine's gifts that day. Further, although Shawn Jackson was unable to identify a photo of Marcus Williams and testified that he did not know him, Tanikka testified that she, Shawn Jackson, and Marcus Williams all grew up together and she knew that Marcus Williams did not like Shawn Jackson. In fact, Marcus Williams was arrested at the same time and place as the Defendant, on February 9, 2006.

Once the Defendant rested, the Defendant renewed his Motion for Acquittal, which was again denied on the same basis discussed above. This Court determined that there was a jury issue and, therefore, the motion was denied.

Closing arguments were heard and final jury instructions were provided to the jury.[17] There were no objections by the

---

17. This Court provided both parties with the Court's proposed jury instructions on January 9, 2007, after trail concluded for the day. The parties had ample time to review the instructions. In fact, on the morning of January 10, 2007, in open court and outside the presence of the jurors, the parties suggested revisions to the instructions, and revisions were made. Ultimately, once the final revised jury instructions were tendered to the parties, defense counsel stated that he had no objections to the jury instructions as revised.

parties regarding the final jury instructions tendered to the jury. After retiring to the jury room and a rather short deliberation, the jury returned a verdict of guilty.

## B. Motion for New Trial

Federal Rule of Criminal Procedure 33(a) allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." But "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Fed. R.Crim.P. 33(b)(2); *See also, Eberhart v. U.S.*, 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005); *U.S. v. Ogle*, 425 F.3d 471, 476 (7th Cir.2005). On a motion for a new trial, the Court may reweigh the evidence, taking into account the credibility of the witnesses. *U.S. v. Washington*, 184 F.3d 653, 657–58 (7th Cir.1999), *cert. denied*. If the court reaches the conclusion that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—it has the power to set the verdict aside; however, Rule 33's conferral of discretion on the district court is not a license to abuse it. *U.S. v. Santos*, 20 F.3d 280, 285 (7th Cir.1994), *r'hrng. denied* (citing *U.S. v. Morales*, 902 F.2d 604, 605–06 (7th Cir.1990), *amended, U.S. v. Morales*, 910 F.2d 467 (7th Cir.1990)). The motion is addressed to the discretion of the court, and the power to grant a new trial should be exercised with caution and invoked only in the most extreme cases. *Id.; U.S. v. Linwood*, 142 F.3d 418, 422 (7th Cir.1998), *cert. denied* (citations omitted).

The Defendant argues that this Court should order a new trial in the interests of justice. Broadnax asserts that he is entitled to a new trial based on the grounds previously identified. He does not elaborate on his contentions and provides no authority or argument in support of his contentions asserted in his barely two (2) page motion. The Seventh Circuit has held, "[p]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991), *cert. denied* (citations omitted). This Court does not bear the obligation of researching and constructing the legal arguments open to the parties, especially when they are represented by counsel. *Beard v. Whitley County REMC*, 840 F.2d 405, 408–09 (7th Cir.1988) (citations omitted). This is true even in the criminal context. *U.S. v. Holm*, 326 F.3d 872, 877 (7th Cir.2003) (citing *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986)). This Court will not shy from summarily dismissing allegations of error where a party has presented undeveloped arguments unsupported by pertinent authority. Nevertheless, in the interest of thoroughness, each of Broadnax's arguments will be addressed in turn.

### i. Juror bias to drugs, drug dealers or recovery

■ Broadnax contends that the jury selection process violated his Sixth Amendment rights because no questions were asked of prospective jurors regarding "their attitudes toward drugs, drug dealers or recovery."

A district judge has broad discretion in determining what questions may be asked during voir dire. *U.S. v. Sababu*, 891 F.2d 1308, 1325 (7th Cir.1989) (citations omitted). During voir dire, this Court posed general questions to the entire group, followed by a series of additional questions put to each individual. After asking the entire group whether any prospective juror had been trained or had occasions to deal with controlled substances, no juror responded affirmatively. Further, this Court exercised its discretion in not specif-

ically asking jurors about their feelings about drugs, alcohol, and the like.

At no time did Defendant object to the voir dire questions asked, nor did the Defendant request this Court to ask further questions of the prospective jurors. The failure to do so, and the failure to direct this Court's attention to any authority supporting its assertion, amounts to a waiver of the Defendant's ability to claim that a new trial should be granted on this basis.

Even if Broadnax had not waived the opportunity to request a new trial based on the alleged inadequacy of voir dire, the Defendant has made no showing that this Court's voir dire failed to provide a basis for the exercise of his right to challenge. *See, Sababu,* 891 F.2d at 1325. The Defendant generally relies on the importance of ferreting out biased jurors and does not cite to any facts suggesting that he was denied an adequate basis for a reasonably knowledgeable exercise of the right to challenge jurors. Indeed, the jurors were instructed to perform their duties fairly and impartially, and to not allow sympathy, prejudice, fear, or public opinion to influence them. (Court's Instruction No. 1). The Defendant has not demonstrated the inadequacy of the questioning during voir dire. More importantly, the Defendant has not demonstrated that the voir dire conducted here, resulted in an innocent person being convicted, therefore this Court denies the Defendant's motion to grant a new trial.

### ii. No African Americans present in array or venire

Broadnax contends that the jury selection process violated his Sixth Amendment rights because no African Americans were included in the array or venire.[18]

■ The Constitution requires that grand jurors and the venire of petit jurors be chosen from a fair cross-section of the community. *U.S. v. Raszkiewicz,* 169 F.3d 459, 462 (7th Cir.1999) (citations omitted). The jury must be chosen from a source which is representative of the community, but the Constitution does not require this to ensure representative juries, but rather impartial juries. *Id.* (other citations omitted). Accordingly, there is no requirement that a venire or a jury mirror the general population, so long as there is a fair process which generates an impartial jury. *Id.*

■ To establish a prima facie case that a Defendant's Sixth Amendment rights to a venire drawn from a fair cross-section of the community were violated, the defendant must show that the group allegedly excluded is a distinctive part of the community; that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 363, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *See also, Johnson v. McCaughtry,* 92 F.3d 585, 590–95 (7th Cir.1996), *cert. denied; U.S. v. Guy,* 924 F.2d 702, 705–07 (7th Cir.1991); *Davis v. Warden Joliet Correctional Inst. at Stateville,* 867 F.2d 1003 (7th Cir.1989), *cert. denied.* If the defendant establishes these elements, the government must show that an overriding, significant state interest is manifestly advanced by those aspects of the jury selection process that result in the disproportionate exclusion of a distinctive group. *Id.*

■ The jury array and venire in this case was selected in accordance with the Amended Jury Selection Plan (2005) ("Amended Jury Plan"), as authorized by

---

**18.** The Defendant has not asserted that this Court failed to adequately inquire about the possible racial prejudice of the prospective jurors.

The United States District Court for the Northern District of Indiana, effective August 4, 2006.[19] *See, U.S. v. Guy*, 924 F.2d 702, 705–06 (7th Cir.1991) (including similar discussion regarding selection of prospective jurors). The Amended Jury Plan directs that the Clerk of the Court, under the supervision and control of the Chief Judge, manage the jury selection process. For jury selection purposes, the Northern District of Indiana is divided into four (4) subdivisions: The South Bend Division, the Hammond Division at Hammond, the Fort Wayne Division, and the Hammond Division at Lafayette. The South Bend Division, from which the jurors were drawn in the present case, consists of eleven (11) counties located in and around the City of South Bend in the northern part of the state.

The Amended Jury Plan declares that the policy of this Court is that all litigants who are entitled to a trial by jury "shall have the right to grand and petit jurors selected at random from a fair cross section of the community in the District or division wherein the Court convenes . . .". The Amended Jury Plan also explicitly prohibits discrimination.

Additionally, the Amended Jury Plan states that sources from which the names of grand and petit jurors shall be selected at random shall be from the general election voter registration lists,[20] and that such lists represent a fair cross section of the community in the Northern District of Indiana. After determining the total number of names needed for the master wheel and then the proportional share of names to be drawn from the list of voters for each

particular county, the Clerk of the Court is required to select names from the complete source list databases in electronic media accomplished by a purely randomized process approved by the National Institute of Standards and Technology. A similar pure randomized selection process is used to select names from the master wheel for the purpose of determining qualification for jury service, and from the qualified wheel for summoning persons to serve as grand or petit jurors. Potential grand and petit jurors are, thus, chosen at random from the master voter registration lists for each county. The total number of names drawn for each division depends upon whatever number may be deemed sufficient for the Courts grand and petit jury needs for a minimum of two (2) years. The Amended Jury Plan ultimately concludes that the selections of names from the source (voter) list, the master wheel, and the qualified wheel must ensure that the mathematical odds of any single registered voter being called for service are substantially equal.

In the instant case, Defendant has satisfied the first prong of the *Duran* test in that there is little doubt that African Americans are a distinctive group in the community. *See, Davis*, 867 F.2d at 1006. However, the Defendant has not presented any evidence to support his claim that the selection of the jury was improper or that the representation of African Americans from the master wheel or on the jury list is not fair and reasonable in relation to the number of African Americans in the community. Additionally the Defendant has not offered any evidence that anyone was systematically excluded from the jury se-

**19.** The Amended Jury Plan was adopted by the United States District Court for the Northern District of Indiana on June 12, 2006, pursuant to 28 U.S.C. § 1863(a) and approved by the reviewing panel on August 1, 2006, pursuant to 28 U.S.C. § 1863(a).

**20.** The Amended Jury Plan specifies that the voter registration lists refer to registered voters of the counties within each division who are of record as registered voters in each presidential general election as maintained in the books or lists at the Board of Elections in each county.

lection process. The Defendant's mere observation that there were no African Americans on a panel that was drawn from a population containing African Americans is simply not sufficient to demonstrate any systematic exclusion. *Guy,* 924 F.2d at 706 (citations omitted). The Defendant has failed to satisfy the *Duran* test and has not shown that a miscarriage of justice has occurred. Therefore, his motion for a new trial based on jury selection is denied.

### iii. Coercion of confidential informant Rashawn Jackson

■ Where the Defendant does not object to the admission of evidence during trial, such objection is waived and cannot be raised for the first time on a motion for a new trial. *U.S. v. Hack,* 205 F.2d 723, 727 (7th Cir.1953), *cert. denied. See also, Whitford v. Boglino,* 63 F.3d 527, 535 n. 10 (7th Cir.1995), *r'hrng denied* (citations omitted) (discussing that waiver rules are important to insure that judges do not take over the function of lawyers).

Here, Defendant did not file a motion in limine or otherwise object to the testimony of Rashawn Jackson during the trial. Therefore, where the Defendant knew that the recorded conversations between Jackson and himself were going to be produced (as evidenced by the Government's Proposed Exhibit List filed on January 5, 2007, Docket No. 38), and where the Defendant has not alleged that the Government's witness, Rashawn Jackson, was provided any agreement as to his future prosecution which was unknown to the Defendant, the Defendant has waived any claim as to the inadmissibility of Jackson's testimony.

Even if Broadnax had not waived the claim of inadmissibility of Jackson's testimony by failing to previously bring it to this Court's attention, Defendant is not entitled to a new trial on this basis. This Court understands that evidence that a witness who has testified for the Government and was provided an understanding or agreement as to his future prosecution is relevant to that witness' credibility. *See, U.S. v. Price,* 418 F.3d 771, 785 (7th Cir.2005). Here, there was no evidence suggesting with certainty that there was an agreement between the Government and Jackson, and no documents suggest any promise from the Government to Jackson. The evidence at trial simply showed that the officers informed Jackson that if he cooperated, the extent of his cooperation would be made known to the local prosecutor's office. Also the record reflects that defense counsel was quite aware of the possibility that Jackson had something to gain from cooperating. Defense counsel had the opportunity to cross-examine, and in fact, the Defendant did cross-examine Jackson regarding his possible motive to fabricate. The Defendant even informed the jury that Jackson could face a mandatory minimum sentence of ten (10) years. *See, U.S. v. Diaz,* 876 F.2d 1344, 1350 (7th Cir.1989). Although these facts alone are enough to support the conclusion that Defendant's Fifth Amendment due process rights were not violated by Rashawn Jackson's testimony, this Court further instructed the jury that Jackson's testimony should be considered with "caution and great care."[21]

---

**21.** Court's Instruction No. 12 stated:

You have heard testimony from Rashawn Jackson, who:

(a) has stated that he was involved in the commission of the offense as charged against the Defendant Greg Broadnax; and

(b) has received benefits from the government in connection with this case.

You may give the testimony of this witness such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

The Court also provided the following instruction concerning witness credibility in Court's Instruction No. 5:

Therefore, because Defendant has not shown that his constitutional rights were violated, nor that this is one of those cases where an innocent man has been convicted, the Defendant's motion for a new trial on this basis is denied.

### iv. Chain of custody for cellular telephones

■ As previously stated, where the Defendant does not object to the admission of objectionable evidence during trial, such objection is waived and cannot be raised for the first time on a motion for a new trial. *Hack*, 205 F.2d at 727; *See also, Whitford*, 63 F.3d at 535 n. 10. Here, the Defendant did not file a motion in limine or otherwise object to the admission of the cellular telephones into evidence. Nor did the Defendant object to the photographs depicting the cellular phones. Therefore the Defendant has waived any claim as to the inadmissibility of cellular phones.

Even if defendant had not waived a claim of inadmissibility of the cellular phones due to an allegedly unreliable chain

of custody, Defendant is not entitled to a new trial on this basis. The general standard for the admissibility of evidence is that it be "in substantially the same condition as when the crime was committed." *U.S. v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), *r'hrng. denied* (citations omitted). A perfect chain of custody is not a prerequisite to admission. *Id.* (other citations omitted). Unless the defendant can point to evidence that specifically raises the issue of tampering, a presumption of regularity attaches to evidence that has at all times been kept in official custody, and any gaps in the chain of custody go to the weight of the evidence, not to its admissibility. *Id.*

Despite Defendant's protestations to the contrary, and as previously argued in Defendant's Motion for Acquittal, this Court finds that the cellular phones were in official custody at all times, that there was no evidence that they were no longer in their original condition, and that there was no evidence to suggest that they had been

You, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you determine the importance or the weight that their testimony deserves. After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness' testimony, only a portion of it, or none of it.

In making your assessment of that witness you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief. Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand. Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters. Consider also any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the

extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing an incident or a transaction may simply see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon human experience. In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail and consider whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment or assessment concerning the believability of a witness, you can then attach such importance or weight to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the government has proven the charge beyond a reasonable doubt.

tampered with or otherwise tainted. Further, to the extent that Defendant argues that there was some confusion as to where each cell phone was recovered, this Court finds that there was sufficient evidence of recovery produced at trial and that, ultimately, the jury was responsible for determining the weight of the evidence. Although defense counsel again did not offer any facts in support of his position, the evidence at trial established a reliable chain of custody.

Here, it is undisputed that two (2) cell phones were recovered from Broadnax's pockets and that one (1) of the cell phones was recovered from the console of the Camry, next to Broadnax. The evidence is undisputed that Jackson had placed several phone calls to one of the telephones, and those calls coincided with the time of Broadnax's arrival at the Econo Lodge parking lot. Further, Sergeant Eric Kaser testified that he observed Jackson dial the numbers on his cell phone to call Broadnax, calls which were recorded on the phone history of one (1) of the cell phones recovered at the scene. Lastly, the evidence showed that once the patdown search of Broadnax revealed the two (2) phones, the phones were photographed and placed into evidence bags by the evidence technician, who also processed the cell phones and identified the cell phone used to communicate with Jackson. Defendant has not shown any facts entitling him to a new trial on the basis of an unreliable chain of custody between the cell phones, and for this reason, Defendant's motion is denied.

### v. Introduction of transcripts of recorded telephone calls

█ Broadnax contends that this Court erred when it allowed transcripts of the recorded conversations to be admitted into evidence because Broadnax was not identifiable, only Jackson could be understood in the recordings, and the prejudicial effect of introducing the transcripts outweighed their probative value. Broadnax's contention concerns the transcripts themselves. Further, defense counsel did not object during trial to the recordings which were played to the jury, but objected to the introduction of the transcripts into evidence. Therefore, this Court will address only the argument raised in Defendant's motion for a new trial, regarding the admission of the transcripts.

The decision to allow the transcripts to be used during deliberations is committed to the sound discretion of the district court. *U.S. v. Crowder,* 36 F.3d 691, 697 (7th Cir.1994), *cert. denied* (citing *U.S. v. Camargo,* 908 F.2d 179, 183 (7th Cir.1990); *U.S. v. Doerr,* 886 F.2d 944, 966 (7th Cir. 1989)). Here, defense counsel objected to the admission of the first transcript on the grounds that the recording was the evidence, not the transcript. Defense counsel objected to the admission of the second transcript on the same grounds, and added that the transcript was a summary, argumentative, and the foundation was leading. This Court did not admit the transcripts until it was satisfied that a proper foundation had been laid and the transcripts contained indices of accuracy. But beyond making sure that the transcript is reasonably accurate, it is not this Court's job to resolve every dispute as to who said what on the tape. *See, U.S. v. Howard,* 80 F.3d 1194, 1199 (7th Cir.1996), *r'hrng. denied. See also, U.S. v. Jordan,* 223 F.3d 676, 688 (7th Cir.2000) (holding that if a tape is generally audible, but only partially inaudible, the inaudible portions may affect its weight, a determination to be left to the jury). Here, Jackson reviewed the transcripts, identified the transcripts as the same transcripts that he helped prepare, testified that the transcripts accurately

represented the words spoken in the recorded conversations, and he identified the two (2) speakers on the recordings[22] as depicted in the transcripts and based on his familiarity with Broadnax's voice. Also, defense counsel cross-examined Jackson regarding the transcripts. Defense counsel did not contend that the transcripts were inaccurate, nor did he proffer alternative transcripts of the conversations. Moreover, this Court admonished·the jury that what it heard was the evidence, and subsequently provided the jury with a written instruction as to the limited use to be made of the transcripts.[23] The jury was given ample guidance as to the nature of the transcripts.

Defendant's conclusory arguments concerning the inadmissibility or prejudicial effect of the transcripts with no indication that the verdict was adversely affected, is not sufficient. Because this Court is certain that a miscarriage of justice has not resulted from introduction of the transcripts, the Defendant's motion for a new trial on this basis is denied.

### vi. Reasonable doubt as to Defendant's role in transaction

Broadnax contends he is entitled to a new trial because reasonable doubt existed as to his role in the transaction. This Court again notes that defense counsel has not provided any propositions of law in support of Defendant's position, nor has he offered any application of the law to the facts in this case. Instead, counsel merely asks the question "Was one of the other occupants of the Toyota the actual party with whom Jackson dealt?" In other words, Broadnax argues that the Government failed to establish sufficient evidence in order to meet it's burden of proving Broadnax's guilt beyond a reasonable doubt.

A defendant who attacks the legal sufficiency of the evidence supporting a conviction "faces a nearly insurmountable burden." *U.S. v. Phillips*, 239 F.3d 829, 842 (7th Cir.2001), *cert. denied.* (citing *U.S. v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996)). Great deference is given to the finding of the jury. *Phillips*, 239 F.3d at 842 (citing

---

22. The Court provided a jury instruction regarding statements allegedly made by the Defendant in Court's Instruction No. 9:

Evidence has been received concerning statements said to have been made by the defendant. It is for you to determine whether the defendant did in fact make such statements. If you find that the defendant did make the statements, then you must determine what weight, if any, you feel the statements deserve. In determining what weight, if any, should be given the statements, you should consider all matters in evidence having to do with the statements, including those concerning the defendant's personal characteristics and the conditions under which the statements were made.

23. In pertinent part, Court's Instruction No. 3 read:

... You have heard recorded conversations. These recorded conversations are proper evidence and you may consider them, just as any other evidence.

When the recordings were played during the trial, you were furnished transcripts of the recorded conversations [prepared by government agents].

The recordings are the evidence, and the transcripts were provided to you only as a guide to help you follow as you listen to the recordings. The transcripts are not evidence of what was actually said or who said it. It is up to you to decide whether the transcripts correctly reflect what was said and who said it. If you noticed any difference between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. And if after careful listening, you could not hear or understand certain parts of the recordings, you must ignore the transcripts as far as those parts are concerned.

*U.S. v. Penny*, 60 F.3d 1257, 1262 (7th Cir.1995)). The jury's verdict will be overturned "only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *Phillips*, 239 F.3d at 842 (citing *U.S. v. Rosalez–Cortez*, 19 F.3d 1210, 1215 (7th Cir.1994)).

Review of the record shows that the jury was fairly charged as to the elements of the offense that Defendant was charged [24] and as to the law regarding the Government's burden to prove the Defendant's guilt beyond a reasonable doubt, in order to find Broadnax guilty of the charge of Possession with Intent to Distribute. Further, the jury was instructed that the "Defendant's presence at the scene of a crime and knowledge that a crime was being committed is not alone sufficient to establish his guilt." (Court's Instruction No. 23). The jury was instructed that if the Defendant "performed acts that advanced a criminal activity but had no knowledge that a crime was being committed or was about to be committed, those acts alone are not sufficient to establish the defendant's guilt ..." (Court's Instruction No. 14). Whether or not the Defendant played the role in the transaction that met the elements of the crime, and whether or not the Government proved its case beyond a reasonable doubt,

was the question the jury decided on January 10, 2007.

This Court has taken considerable time in setting forth the evidence presented at trial. The evidence established that Broadnax participated in the phone calls setting up the drug deal and specified the amount he would sell one (1) ounce of crack for, Broadnax arrived a the Econo Lodge as directed, and Broadnax was driving the Camry identified by Jackson. Further, once blocked into the parking lot space, Sergeant Flanagan observed Broadnax lean slightly to his right and bend downward—as if he was putting something on the floor board of the Camry, not as if he was placing the car in park. When Broadnax was removed from the car, the plastic bag containing 27.1 grams of crack cocaine was located where Broadnax had reached. Further, one of the three cell phones located near Broadnax, if not on his body, was the cell phone used to communicate with Jackson in setting up the drug deal. This Court simply cannot reach the conclusion that a miscarriage of justice has occurred when the jury found Gregory Broadnax guilty. Therefore, because this Court does not find that reasonable doubt existed as to Broadnax's role in the transaction, the Defendant's motion for a new trial is denied.

---

**24.** Court's Instruction No. 15 read:

To sustain the charge of possessing cocaine base (crack) with intent to distribute as charged in the Indictment, the government must prove the following propositions:

First, the defendant knowingly or intentionally possessed cocaine base (crack);

Second, the defendant possessed cocaine base (crack) with the intent to deliver it to another person;

Third, that the amount of cocaine base (crack) was in the amount of five grams or more.

It does not matter whether the defendant knew the substance was cocaine base (crack). It is sufficient that the defendant knew that it was some kind of prohibited drug.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

A copy of the Indictment is attached here.

## III. CONCLUSION

Based on the foregoing, this Court cannot conclude that this is one of those extreme cases allowing the Court to order a new trial. Therefore, the jury verdict rendered on January 10, 2007, finding Defendant, Gregory Broadnax, guilty of violating 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute five grams or more of a mixture and substance which contained a detectable amount of cocaine based ("crack"), a Schedule II Controlled Substance, still stands. Accordingly, Defendant's Motion for a New Trial (Docket No. 48) is **DENIED. SO ORDERED.**